UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| Linda Wilson,<br>    *Plaintiff*,<br><br>    *v.*<br><br>Emhart Teknologies LLC,<br>    *Defendant*. | Civil No. 3:06cv1338 (JBA) |
|---|---|

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this employment-discrimination action, Plaintiff Linda Wilson alleges that her former employer, Defendant Emhart Teknologies LLC ("Emhart"), unlawfully discriminated and retaliated against her. Wilson seeks relief pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and 42 U.S.C. § 1981. (Compl. [Doc. # 1] ¶¶ 1–2.) Emhart has moved for summary judgment, which, for the reasons that follow, will be granted.

**I.    Factual Background[1]**

Emhart, a subsidiary of Black & Decker, is a manufacturer of commercial fasteners. Linda Wilson began working for Emhart in June 2003 as a human resources administrator (an hourly, non-exempt position) at the company's Danbury, Connecticut facility. At first, she was supervised by Howard Reznik, the human resources manager. Although Wilson's early performance reviews were positive, by at least November 2004 Reznik observed that she was having difficulty completing her work in a timely fashion. He instructed her that she was to work no more than forty-five hours per week without prior authorization, and

---

[1] The factual record is taken in the light most favorable to Wilson as the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).

reiterated this constraint later in February. Reznik retired in April 2005, after which Paul O'Brien, based in the company's human resources office in Shelton, was assigned to supervise Wilson. Wilson continued to have problems meeting her hours target under O'Brien, and he repeated the direction that she not work more than forty-five hours unless authorized; O'Brien also asked her to improve her attitude toward her co-workers. Wilson's written performance evaluation in June 2005 was generally positive, but her working relationship with O'Brien thereafter degenerated due to her continued defiance of the weekly hour limit.

On July 20, 2005, after O'Brien once again discussed her hours with her, Wilson called the company's ethics hotline to complain about O'Brien's treatment of her. She reported that O'Brien had refused to hire more employees to assist her in the human resources department, cited her hourly limitation of forty to forty-five hours per week, and described a recent phone call from O'Brien in which he said, "Let me make myself crystal clear to you. You will not work over 45 hours per week without my written permission first." (Def.'s Ex. 6 [Doc. # 46] at 1.) In response, a corporate human resources manager, Holly Edington, contacted Wilson to follow up regarding her complaints. When they spoke in August 2005, Wilson alleged that O'Brien's conduct had also been racially discriminatory, but emphasized how the dispute was really about her weekly hours. The next month, Edington came to Connecticut to investigate further, during which time she interviewed Wilson, O'Brien, and several other Emhart employees. Through this investigation, Edington learned that many of Wilson's co-workers saw her as "rude, curt, and extremely impatient," but found no evidence of any unlawful conduct by O'Brien or anyone else. (Edington Aff. [Doc. # 48] ¶¶ 9–10.) Nevertheless, Emhart again changed Wilson's supervisor in September

2

2005, and shuffled the assignments in Danbury so that Wilson reported to John Carvalho, the facility's plant manager. As part of this change, Wilson moved offices to be closer to Carvalho's.

Still, in October 2005 Wilson filed an administrative charge with the CHRO, alleging that Emhart was discriminating and retaliating against her on account of her race, and summarizing essentially the same facts as above as the basis for her complaint. The substance of her allegations were as follows:

> I believe that [Emhart] discriminated against me based on race (African-American) and color (Black) based on [Emhart's] conduct of assigning me additional duties, though not assigning the same or similar duties to Caucasian White employees . . . [and] based upon [Emhart's conduct of limiting my work hours and refusing to hire additional staff despite the additional duties that have been assigned to me, thereby making it more difficult for me to perform and complete my duties . . . .
>
> I also believe that [Emhart] retaliated against me for previously opposing, filing[,] or assisting against conduct reasonably believed to be discriminatory based upon [Emhart's] conduct of moving my office to a location for, on information and belief, the purpose of watching my conduct more closely, and further limiting my work hours only after, but never before, I had filed a complaint through [Emhart's] ethics hotline . . . .

(Pl.'s Ex. F [Doc. # 53] at 1, 3–4.) Wilson elaborated on the actions she believed to be discriminatory in her deposition, when she described how Emhart had reviewed benefit programs with other employees (Wilson Dep., May 9, 2007 [Doc. # 46], at 93:11–94:6); had not reimbursed Wilson for travel mileage, though she never so requested (*id.* 94:7–95:14); had allowed other employees to work from home, though Wilson never pursued the same arrangement (*id.* 95:15–19); had given others company credit cards, though Wilson never asked for one and was always reimbursed (*id.* 96:3–97:5); had moved her office to a "hot" office with "no ventilation" such that a fan was installed, and with a half door (*id.* 97:9–18);

3

and generally had "[d]iminished" her role, showed her "disrespect," and treated her "secondhand" (*id.* 126:1–128:13).

After her office was moved and she began reporting to Carvalho, Wilson remained unhappy and still did not comply with the directive about her hours. Carvalho, like Reznik and O'Brien before him, reprimanded Wilson that she was working more than authorized, and his written evaluation of her in February 2006 reflected as much. Wilson stresses that this was an unexpectedly negative assessment. Six months after this evaluation, Emhart eliminated Wilson's position in Danbury and terminated her employment.

## II.     Discussion[2]

In her complaint, Wilson alleged that her treatment while working for Emhart constituted racial discrimination and retaliation, in violation of Title VII and 42 U.S.C. § 1981. Plaintiff's memorandum in opposition to summary judgment, in which counsel allocated more space to the Rule 56 and Title VII standards than to the substantive reasons why summary judgment should not be granted, does not discuss her discrimination claims and fails to mention § 1981. During oral argument on June 11, 2008, Plaintiff's counsel clarified that Wilson is still pursuing these claims, and so the Court will address each in turn.[3]

To proceed with her Title VII retaliation claim, Wilson must first meet her prima

---

[2] The Rule 56 summary judgment standard is familiar to the parties and the Court, and thus will be applied here without recitation. *See, e.g., Milardo v. City of Middletown*, 528 F. Supp. 2d 41, 44–45 (D. Conn. 2007).

[3] Although Plaintiff uses the phrase "hostile work environment" in her opposition brief to describe the basis for her ethics hotline complaint in July 2005 (Pl.'s Opp'n [Doc. # 52] at 2), there is no further discussion of hostile-work-environment discrimination—in her complaint, administrative charge, or brief—as a possible basis for liability.

4

facie burden by showing that she was engaged in a protected activity, that Emhart was aware of this activity, that she suffered an adverse employment action, and that there was a causal connection between her protected activity and the adverse action. *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002). As the Supreme Court explained in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006), Title VII's "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." This is an objective standard: "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks omitted). Furthermore, the Court cautioned that "normally petty slights, minor annoyances, and simple lack of good manners" in the workplace fall short of this standard. *Id.* If a plaintiff meets her minimal prima facie burden and the defendant counters with legitimate justifications for its actions, then the plaintiff must show that the proffered reasons are merely pretextual. *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1181 (2d Cir. 1996).

For her Title VII discrimination claim, Plaintiff must first establish that she is a member of a protected class, that she was qualified for position, that she suffered an adverse employment action, and that these circumstances together give rise to an inference of discrimination on account of her race. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000). To satisfy the adverse-action element here, a plaintiff must show that she "endure[d] a materially adverse change in the terms and conditions of employment," which "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

5

diminished material responsibilities, or other indices unique to a particular situation." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quotation marks omitted). This requirement stems from the effort to "protect[] individuals from actions injurious to *current* employment or the ability to secure *future* employment." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997).

These Title VII claims parallel the same allegations Wilson has also brought pursuant to § 1981. Counsel agreed at oral argument that the discrimination and retaliation claims under both statutes are "identical." *See Lauture v. Int'l Bus. Mach. Corp.*, 216 F.3d 258, 260 (2d Cir. 2000) (holding that at-will employees may proceed with employment discrimination claims under § 1981); *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998) ("An act of retaliation for engaging in activity protected by Title VII does not give rise to a claim for retaliation that is cognizable under § 1981 unless that activity was also protected by § 1981."); *CBOCS West, Inc. v. Humphries*, 128 S. Ct. 1951, 1960 (2008) (recognizing the "'necessary overlap' between Title VII and § 1981" as a "reflect[ion] of congressional design").

The important thread common to these claims is that Wilson must demonstrate that she suffered a sufficiently adverse employment action. She has not carried this burden. The record reveals that Wilson regularly exceeded her authorized weekly hour limit, which persisted even after her supervisor was changed twice. When she complained about her working relationship with O'Brien, the company responded by investigating and changing the office structure so that Wilson reported to Carvalho. The same issue of excessive hours continued, and eventually led Carvalho to give Wilson a written evaluation which reflected her non-compliance with his directive that she not work more than forty-five hours weekly.

Six months later, Emhart eliminated her position.

But Wilson has not alleged wrongful termination, and so the remaining putatively adverse actions are simply the disagreements she had with her supervisors about her authorized weekly hours and her duties relative to her colleagues. Wilson's complaints about her responsibilities and work conditions include: Emhart's misallocation of human-resources staff at the Danbury and Shelton facilities; O'Brien ordering Wilson to do errands and yelling at her; the relocation of her office during re-enrollment season for employee benefit plans; the installation of a half-door to her new office; Carvalho's prohibition on further United Way activities during business hours; her changed human-resources responsibilities; the various ancillary job benefits Wilson desired but admittedly never requested; and the supposedly negative job evaluation by Carvalho in February 2006.[4] These incidents constitute no more than the "petty slights" or "annoyances" which the *Burlington Northern* Court held are not adverse actions, and no reasonable jury could find that they materially affected the conditions of her employment under *Galabya*. Therefore, because

---

[4] The undisputed evidence also shows this evaluation is hardly the negative assessment Wilson claims. Overall, Carvalho's appraisal was that she "meets expectations"—characterized on the form as "a normal, reasonable and expected level of performance"—although he cited many of the workplace problems Wilson had long been having, namely her difficulty staying within her scheduled hours and her "abrupt approach" to her co-workers. (Pl.'s Ex. G at 1.) Plaintiff's Exhibit G also includes what is apparently a rebuttal by Wilson to the content of this February 2006 evaluation. In it, she discussed the issue of her hours and wrote, "I fail to understand how working overtime in order to complete one[']s job responsibilities is an indication of not using good judgment[,] especially when the need of hiring has become much in demand." (Pl.'s Ex. G at 3.) And her claim later in this rebuttal that "there is not one constructive positive statement" (*id.* at 4) is belied by Carvalho's many compliments: "Linda does a good job of preparing the weekly payroll"; "[Linda's understanding about her hours limit] has improved nicely"; "She has it in her to be more pleasant—she just needs to use that skill daily"; "Linda is normally punctual and has no problem coming to work each day" (*id.* at 1).

there is no evidence of an adverse action Wilson suffered, her discrimination and retaliation claims against Emhart cannot proceed.[5]

### III.  Conclusion

Accordingly, Defendant's Motion for Summary Judgment [Doc. # 43] is granted. The Clerk is directed to close the case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 21st day of July, 2008.

---

[5] Moreover, as the Second Circuit has said in a related context, "a jury cannot infer discrimination from thin air." *Lizardo v. Denny's, Inc.*, 270 F.3d 95, 104 (2d Cir. 2001). Even where a plaintiff nominally meets each of the prima facie requirements, this initial showing must still be enough to support an inference of retaliation. *Collins*, 305 F.3d at 118; *see also id.* at 119 n.1 (discussing how the prime facie and pretext analyses can "tend to collapse as a practical matter"). No such inference is possible in this case. There are no facts in the record on which a jury could conclude that Emhart unlawfully discriminated or retaliated against Wilson.